UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **Jorge Juan Navarro**, <br><br> Petitioner, <br><br> v. <br><br><br><br> **Todd Lyons**, Acting Director, <br> U.S. Immigrations and Customs Enforcement; <br> **David Wesling**, Acting ICE Boston Field Office <br> Director, U.S. Immigration and Customs <br> Enforcement; and <br> **Antone Moniz**, Superintendent, <br> Plymouth County Correctional Facility, <br><br><br> Respondents. | Case No. 1:26-cv-10876 |

**PETITIONER'S SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

Through the instant Memorandum, Petitioner Jorge Juan Navarro submits this supplement in further support of his petition for writ of habeas corpus pursuant to the Joint Proposed Supplemental Briefing Schedule allowed by the Court, on March 11, 2026, Doc. No. 16.

**ARGUMENT**

The central point in this case, and one that Respondents seek to avoid, is that ICE violated the regulatory procedures governing revocation of release under 8 C.F.R. §§ 241.13 and 241.4(l). Those procedures required written notice of the reasons for revocation and then an

1

opportunity for the Petitioner to respond. The record here demonstrates that Mr. Juan Navarro's re-detention preceded service of the written notice of revocation. Furthermore, the notice only contained a conclusory statement rather than individualized reasons for revocation, which is clearly insufficient because Mr. Juan Navarro cannot contest the reasons when none are provided. No actions taken after his unlawful re-detention can cure those violations.

Respondents cannot justify unlawful action with more unlawful action. ICE's stated intent to remove Mr. Juan Navarro to Mexico, a third country with which he has no ties, is yet another post hoc justification for his re-detention that does not cure the regulatory violation. Furthermore, the current Administration's third country removal policy has been deemed unlawful and set aside by this Court.[1]  *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2026 WL 521557, at *42, *44 (D. Mass. Feb. 25, 2026). As applied to Mr. Juan Navarro, the policy violates his procedural due process rights under the Fifth Amendment of the U.S. Constitution.

Therefore, the only appropriate remedy is to order Mr. Juan Navarro's immediate release from ICE custody under the conditions of his prior Order of Supervision. Furthermore, the Court should order procedural protections regarding re-detention if ICE seeks to effectuate removal to any third country.

I.    **Respondents have failed to demonstrate that Mr. Juan Navarro's re-detention complied with their own regulations**

Once ICE releases a noncitizen pursuant to 8 U.S.C. § 1231 and its implementing regulations, it may not simply re-detain that person at will. The regulations in 8 C.F.R. § 241.13 were promulgated solely to provide a process so that individuals like Mr. Juan Navarro would

---

[1] The First Circuit entered a stay pending an expedited appeal on March 16, 2026. Briefing will be complete on or before April 20, 2026.

not be subjected to arbitrary re-detention.  The First Circuit in *Kong v. United States* made it clear what ICE must do before it re-detains Mr. Juan Navarro.  62 F.4th 608, 619-20 (1st Cir. 2023).  Here, ICE made no individualized determination that, based on changed circumstances, removal has become significantly likely in the reasonably foreseeable future.  *See* Notice of Revocation of Release, Doc. 10-1 at Sub-Exhibit A.

The revocation of Mr. Juan Navarro's OSUP and ICE's re-detention of him violates both 8 C.F.R. §§ 241.13 and 241.4(l) because they require that the noncitizen be notified of the reasons for revocation.  The notice of revocation of release makes the conclusory statement that the government can effectuate his removal because they are seeking travel documents to Cuba. The regulations require "meaningful notice of the basis for its revocation."  *See Mota Ramos v. McDonald,* No. 25-cv-13363-MJJ, Doc. No. 18 (D. Mass. Dec. 12, 2025); *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224 (D. Mass. 2025).  Parroting the language of the regulation does not constitute adequate notice as to why Mr. Juan Navarro's particular release has been revoked.  *See Nguyen v. Lyons*, 1:25-cv-00631, (D.R.I. Jan. 16, 2026).  Respondents do not allege any changed circumstances that would have resulted in his removal to Cuba.  Doc. 10-1, at Sub-Exhibit A. Merely seeking travel documents to Cuba is not a sufficient reason to re-detain Mr. Juan Navarro because ICE could have requested travel documents without depriving Mr. Juan Navarro of his liberty by placing him in ICE custody.  *See* 8 C.F.R. § 241.13(i)(2) (requiring changed circumstances to have occurred in order to revoke release); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 28-29 (D.R.I. 2014), *aff'd at* 793 F. 3d 208 (1st Cir. 2015) (detention by ICE to investigate removability of individual without factual basis to justify detention is unconstitutional).  Furthermore, there is no evidence that ICE actually commenced any effort to remove him to Cuba at the time he was re-detained.  *See Tran v. Hyde*, 2025 WL 3724853, at *3;

*Nguyen v. Hyde,* 788 F. Supp. 3d 144, 152 (D. Mass 2025 June 20, 2025) (granting habeas petition where Respondents had not identified "concrete steps ICE has taken to process Petitioner's particular travel document.").

**II.    The intent to effectuate a third-country removal does not and cannot cure the regulatory regulations**

Respondents cannot justify Mr. Juan Navarro's current detention by relying on a post hoc notice of intent to remove him to Mexico as evidence of changed circumstances.  *See* 8 C.F.R. § 241.13(i)(2); *Huynh v. Wesling*, 2026 WL 183467, at *3 (D. Mass Jan.23, 2026); *Munagi v. McDonald*, 2025 WL 3688023, at *2 (D. Mass. Dec. 19, 2025) ("[T]he changed circumstances that make [a noncitizen's] removal likely in the foreseeable future must have existed at or before the [order of supervision] revocation; post-hoc justification are inadequate.").  The notice of revocation of Mr. Juan Navarro's release contains no mention of changed circumstances or the potential of any other country accepting him.  Doc. 10-1 at Sub-Exhibit A.  The intent to remove him to Mexico amounts to nothing more than another post hoc rationalization of an unlawful re-detention.  Respondents' reliance on a supposed unwritten agreement with Mexico to accept non-Mexican deportees is insufficient to support Mr. Juan Navarro's re-detention because the effort to deport him under that agreement had not occurred at the time of his re-detention.  *See Tran v. Hyde*, 2025 WL 3724853, at *3 (looking at factors based upon "information that would have been available at the time that [petitioner] was redetained.").  Respondents admit that they pivoted after his re-detention to pursue efforts to remove him to Mexico.  Doc. 7-1 at ¶ 20, Doc 17 at *9.  Still, there has been no evidence that the Government of Mexico has specifically accepted Mr. Juan Navarro as a deportee.  *See Nguyen v. Hyde*, 788 F. Supp. 3d at 152.

Respondents have failed to produce a written document or any supporting evidence of the assertion that they are able to remove Mr. Juan Navarro to Mexico. ICE's declaration references a "standing agreement" between the United States and Mexico. Doc. 7-1 at ¶ 19. Respondents allege that ICE is referencing an agreement made in January 2023 with the creation of the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole program in which the Government of Mexico agreed to accept non-Mexican deportees, contingent on the United States accepting these nationals into the United States through this parole program. Doc. 17. However, the CHNV parole program was terminated through a Federal Register Notice on March 25, 2025. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (March 2, 2025). The Federal Register Notice itself acknowledges that the United States Government would pursue other policy initiatives to effectuate removals of CHNV nationals to Mexico, which suggests that any agreement with Mexico to accept CHNV nationals was terminated when the CHNV parole program was terminated. *Id.* ("Whereas implementation of the CHNV parole programs was contingent upon the Government of Mexico ("GOM") making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return, remove, or deter the illegal migration of CHNV nationals and other aliens."). Therefore, ICE could not have relied on the CHNV agreement as a changed circumstance that would have made Mr. Juan Navarro's removal to Mexico reasonably foreseeable.

Even if the CHNV agreement was still in effect at the time that ICE re-detained Mr. Navarro, it does not apply to Mr. Juan Navarro because, contrary to Respondents' assertions, the Government of Mexico did not agree to accept all Cuban nationals who cannot establish a legal basis to remain in the United Stated. Rather, the Government of Mexico specifically agreed to

accept nationals from Cuba, Haiti, Nicaragua and Venezuela "who do not avail themselves of

[the CHNV parole] process, attempt to enter the United States without authorization, **and** cannot

establish a legal basis to remain." *See* U.S. Dep't. of Homeland Security, "DHS Continues to

Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe

and Orderly Processes," (Jan. 5, 2023) available at

https://www.dhs.gov/archive/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-

new-border-enforcement-measures-and (last accessed March 19, 2026) (emphasis added).  This

agreement clearly contemplated Mexico's acceptance of people who attempted entry into the

United States after the establishment of the CHNV program. Mr. Juan Navarro—who entered the

United States approximately 30 years before the program was initiated—would not have been

accepted under this agreement.  Further, Mr. Juan Navarro entered the United States with express

authorization because he was admitted as a refugee, which further supports the fact that he would

not have fallen under the agreement. *See* Notice to Appear, Doc. 17-2.

An unwritten agreement does not suffice as evidence supporting ICE's assertion that Mr.

Juan Navarro could be removed in the reasonably foreseeable future to Mexico.  A reference to a

"standing agreement" without producing a written agreement is even less than what the Court

has already found to violate 8 C.F.R. § 241.13. *See Nguyen v. Hyde*, 788 F. Supp. 3d at 152

(concluding that a written Memorandum of Understanding alone is not enough to show ICE has

met their burden).  Respondents' vague statements about increased likelihood of travel document

issuance and reliance on the alleged fact that other Cuban nationals have been deported to

Mexico are insufficient to support that there is a significant likelihood that Mr. Juan Navarro will

be deported to Mexico in the reasonably foreseeable future and do not support a changed

circumstance to justify Mr. Juan Navarro's re-detention. *See id.* at 151-52 (noting "Respondents

6

do not even state how and whether the 2020 MOU applies to [the petitioner] specifically."); *Huynh v. Wesling*, 2025 WL 183467, at \*4-6 (D.Mass. Jan. 23, 2026) (concluding that the government did not establish noncitizen was subject to an MOU because they did not provide a copy of it, cite to any of its provision or discussed how it specifically applied to the noncitizen).

Even if Respondents had produced a travel document to Mexico, or any evidence that Mexico is indiscriminately accepting non-Mexican deportees (which it has not), ICE still would not be able to meet its burden under 8 C.F.R. § 241.13(i)(2) because such evidence was not provided at the time of Mr. Juan Navarro's re-detention. S*ee, e.g., Saephanh v. Andrews*, 2025 WL 3467791, \*2-3 (E.D. Cal. Dec. 3, 2025) ("petitioner may have been released following appropriate notice and an opportunity to be heard because respondents have offered no evidence to suggest that, at the time of his [re-detention], respondents had reason to believe that petitioner's removal was reasonably foreseeable."). The fact that ICE is attempting to effectuate a removal to a third country does not eliminate their burden under 8 C.F.R. § 241.13(i)(2) to allege a change of circumstances before re-detention, and even after his re-detention, Respondents have failed to provide reliable evidence that there has been a change in circumstances. *See Gomes-Afonseca v. Lyons*, 2026 WL 538167, \*7-8 (D.Mass. Feb. 26, 2026); *Huynh v. Wesling*, 2026 WL 183467, at \*3; *Munagi*, 2025 WL 3688023, at \*2; *Tran v. Hyde*, 2025 WL 3724853, at \*3.

### III.    The third country removal policy as applied to Mr. Juan Navarro violates Due Process

Even if Respondent's post-hac stated intent to remove Mr. Juan Navarro to a third country justified his re-detention (which it does not), such a removal would violate Mr. Juan Navarro's rights. The Government's policy of denying Mr. Juan Navarro meaningful notice and an

opportunity to be heard on his fear-based claim of removal to Mexico violates Mr. Juan

Navarro's statutory, regulatory, and due process rights, and the United States' commitment to

non-refoulement under international law.  *See* Immigration and Nationality Act § 241(b)(3); Due

Process Clause of the Fifth Amendment; Foreign Affairs Reform and Restructuring Act of 1998

(FARRA), Pub. L. No. 105–277, div. G, tit. XXII, § 2242(a), 112 Stat. 2681, 2681–822 (1998)

(codified at Note to 8 U.S.C. § 1231); *see also* 8 C.F.R. § 1240.10(f); 8 C.F.R. § 1240.11(c)(1)(i);

*Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 144 (W.D.N.Y. 2025) ("Noncitizens, even those

subject to a final removal order, have constitutional rights just like everyone else in the United

States").  The summary judgment decision and final judgment in *D.V.D. v. DHS* found this policy

to be unlawful and granted relief to all class members.  2026 WL 521557, at *42, *44.  Even as it

has been stayed by the First Circuit, the final declaratory and set aside relief remains persuasive[2]

This court's rationale in *D.V.D.* applies to Mr. Juan Navarro's third-country claims.  *See id.*  Mr.

Juan Navarro satisfies the requirements of *D.V.D.* class membership and if the decision takes

effect, it will be binding on Mr. Juan Navarro's case.  *See* 778 F. Supp. 3d 355, 378 (D. Mass.

2025).  Because of the uncertain timing of that decision, it is appropriate for this Court to make a

determination on Mr. Juan Navarro's individual habeas claim.  See 28 U.S.C. § 2243 ("The court

shall summarily hear and determine the facts and dispose of the matter of law and justice

require.").

    Mr. Juan Navarro is entitled to review by an immigration judge to be heard on his fear-

based claim of removal to Mexico, and a denial of that opportunity deprives him of his due

process rights.  Mr. Juan Navarro received a negative determination after an interview with

---

[2] The First Circuit entered a stay pending an expedited appeal on March 16, 2026.  Briefing will be complete on or before April 20, 2026.

USCIS.  Doc. 17-3.  The interview itself was part of the policy that this court in *D.V.D.* found to be unlawful and set aside.  2026 WL 521557, at *34.  The government's conduct in the interview was unlawful because they applied too high of a standard and deprived Mr. Juan Navarro of sufficient notice and an opportunity to present evidence required to meet that standard.  To be clear, the interview of Mr. Juan Navarro was not a reasonable fear interview (RFI), which is the procedure used for other noncitizens who are subject to a final order of removal and in reinstated removal proceedings.  In an RFI, USCIS assesses only if there is a "reasonable possibility" the noncitizen could establish they are likely to face persecution or torture if provided the opportunity to present their full case to an immigration judge.  *See* 8 C.F.R. § 208.31(c) (outlining reasonable fear interview procedure for other persons with final removal orders, like those with reinstatement orders or administrative removal orders).  A "reasonable possibility" is a lower standard of proof than the "more likely than not" standard required to win a grant of withholding of removal or CAT protection.  *Sugiarto v. Holder*, 586 F.3d 90, 95 (1st Cir. 2009) (explaining that the "reasonable possibility" standard "has been defined to include, in some circumstances, even a ten percent possibility" of future persecution or torture) (citing *Cardoza–Fonseca,* 480 U.S. at 440)).  In his interview, Mr. Juan Navarro was subjected to this higher standard, which amounts to a violation of his due process rights.

　　USCIS provided Mr. Juan Navarro and his counsel less than two days' notice to prepare his defense to removal to Mexico.  *See* Doc. 22-1, at Sub-Exhibit A.  In typical withholding and CAT cases, individuals have months to prepare and often submit applications with hundreds of pages of supporting evidence, including testimony, expert witness declarations, and country conditions evidence to explain why a person fears persecution or torture.  The regulations require that "all evidence relevant to the possibility of future torture shall be considered," including

"evidence of gross, flagrant or mass violations of human rights within the country of removal" and "other relevant information regarding conditions in the country of removal." 8 C.F.R. §§ 1208.16(c)(3)(iii) – (iv). The officer conducting the interview denied the request by Mr. Juan Navarro's counsel the opportunity to present evidence relating to country conditions and other supplemental evidence that is routinely submitted when meeting this heightened standard. *See* Doc. 21-1, Arroyo Declaration. Rather, Mr. Arroyo's counsel was only allowed to offer an oral closing with no ability to submit any supporting evidence. *Id.* Thus, Mr. Juan Navarro was both subjected to a higher standard and denied the opportunity to meet this high standard. Such actions amount to a violation of Mr. Juan Navarro's due process rights. *See D.V.D. v. DHS,* 2026 WL 521557, at *34. "[I]t bears mentioning that, even where the Guidance provides some noncitizens (only a subset) with notice and an opportunity to challenge third-country removal, it is still facially inadequate." *Id.* at n.86 (*citing Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow them to actually seek ... relief in the proper venue before such removal occurs."). The Court finds that as little as 24 hours' notice to demonstrate "what would be expected of them in a full hearing on the merits" is not "notice and opportunity to be heard 'appropriate to the nature of the case.' " *Id.* Even four months' notice has been found to not be a constitutionally sufficient process to revoke deferral of removal. *Id. at 34 (citing Khouzam v. Attorney General,* 549 F.3d 235, 240 (3rd Cir. 2008).

Requiring Mr. Juan Navarro to meet a "more likely than not" standard at the screening stage is contrary to law. The FARRA was intended to bring U.S. law "into conformity with its obligations" under international treaties. *INS v. Stevic*, 467 U.S. 407, 427 (1984); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987) (explaining requirements of withholding of

removal were enacted "in order to comply with" Article 33 of the 1951 United Nations Convention Related to the Status of Refugees); FARRA § 1242(b) (explaining that the CAT regulations are "to implement the obligations of the United States under Article 3 of [CAT]," subject to the provisos of the U.S. Senate during ratification). These treaties *require* nations to use procedures that will identify individuals entitled to these mandatory forms of protection, including making inquiries as to individuals' need for international protection, providing guidance regarding their rights, and affirmatively eliciting relevant information.[3]  Third-country removals are subject to the same mandatory protections that exist in removal proceedings.  The CAT regulations implementing the FARRA make clear that individualized CAT protections are mandatory.  *See* Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); *e.g.*, 8 C.F.R. § 1208.16(c) (discussing IJs' individualized assessment of applicants' CAT claims).

DHS cannot functionally eliminate statutory entitlements to mandatory protection from deportation by denying individuals the most basic procedures necessary to obtain them. *See Califano v. Yamasaki*, 442 U.S. 682, 693 (1979) ("[T]his Court has been willing to assume a congressional solicitude for fair procedure, absent explicit statutory language to the contrary."); *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (recognizing that minimum due process rights

---

[3] See, e.g., United Nations High Comm'r for Refugees (UNHCR), Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response ¶¶ 3, 4 (Mar. 16, 2020), https://www.refworld.org/policy/legalguidance/unhcr/2020/en/122898 (explaining that states should "make independent inquiries as to the persons' need for international protection" and that individuals seeking protection "must have access to relevant information in a language they understand and the ability to make a formal asylum claim with the competent authority"); UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 192 (reissued 2019), https://www.unhcr.org/us/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967 (explaining that individuals seeking protection "should receive the necessary guidance as to the procedure to be followed"); UNHCR, Asylum Processes (Fair and Efficient Asylum Procedures) ¶ 5, U.N. Doc. EC/GC/01/12 (May 31, 2001), https://www.unhcr.org/us/media/asylum-processes-fair-and-efficient-asylum-procedures (requiring "[f]air and efficient procedures").

attach to statutory rights). Here, Respondents have rendered the right to seek withholding and CAT protection meaningless by requiring Mr. Juan Navarro to meet the final standard for eligibility in what purports to be an initial, expedited screening interview.[4]

Procedural due process imposes constraints on governmental decisions which deprive individuals of their private interest in not being removed to a country where he would face torture. *See Mathews v. Eldridge*, 424 U.S. 319, 322 (1976). Such removal is "precisely the type of interest that courts consistently have held is significant enough to justify procedural protections to ensure that individuals who are actually entitled to withholding of removal under § 1231(b)(3), or the Convention Against Torture, receive such protection." *Cruz-Medina v. Noem*, 2025 WL 2841488, at *6 (D. Md. Oct. 7, 2025). A decision by a single asylum officer without the opportunity to provide evidence creates an unacceptably high risk of erroneous deprivation. *See id.* The ability to present a fear-based claim to an immigration judge is not an unreasonable burden. The guarantee of due process includes the right to a full and fair hearing by an impartial decisionmaker. *See Mathews*, 424 U.S. at 333. ("The fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner."); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (holding that "[t]he fundamental requisite of due process of law is the opportunity to be heard," which includes "timely and adequate notice.") (quotations omitted); *Mullen v. Cent Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (holding that due process requires "at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the

---

[4] Notably, in 2022, DHS itself recognized that there was "no evidence" that applying heightened screening standards "resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its nonrefoulement obligations." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18092 (Mar. 29, 2022).

case"); *Oakes v. United States*, 400 F.3d 92, 98 (1st Cir. 2005) ("The ubiquity of the 'notice and opportunity to be heard' principle as a matter of fundamental fairness is deeply engrained in our jurisprudence.").

The policy as implemented specifically to Mr. Juan Navarro does not come remotely close to ensuring the procedural protections this Court found were required to comport with due process. *D.V.D.*, 2026 WL 521557, at *42, *44. Mr. Juan Navarro has been denied meaningful notice and opportunity to submit an application for CAT protection to the immigration court. A screening mechanism with no procedural protections on an accelerated basis that provides insufficient notice to meet the burden is not due process. Other courts around the country have held that ICE's third country removal policy violates due process. *See Kumar v. Wansley*, 2025 WL 3204724, at *6 (W.D. Wash. Nov. 17, 2025), *citing Nguyen v. Scott*, 796 F.Supp.3d 703, 728 (W.D. Wash. 2025) (holding due process requires mandating notice and an opportunity to be heard in connection with third country removals); *Baltodano v. Bondi*, 2025 WL 2987766, at *2 (W.D. Wash. Oct. 23, 2025) (same); *Phetsadakone v. Scott*, 2025 WL 2579569, at *4–5 (W.D. Wash. Sep. 5, 2025); *Sagastizado v. Noem*, 802 F.Supp.3d 992, 1008 (S.D. Tex. 2025) (finding petitioner likely to succeed on "claim that he cannot be removed to a third country without sufficient notice and a meaningful opportunity to raise a claim[.]"); *Y.T.D. v. Andrews*, 2025 WL 2675760, at *6 (E.D. Cal. Sep. 18, 2025) ("In this Circuit, due process requires that Petitioner be ... afforded reasonable notice and an opportunity to pursue relief in relation to third country removal."). Further, Respondents' violations of 8 C.F.R. § 241.13 are violations of due process. The post-detention procedures laid out in 8 C.F.R. § 241.13 were intended to provide due process protections, which the government violated by revoking Mr. Juan Navarro's release without complying with the applicable regulations. *See, e.g., Constantinovici v. Bondi*, 2025 WL

13

2898985, at *4-5 (S.D. Cal. Oct. 10, 2025).  Due process also demands more process than what the regulations require.

When the Government is detaining an individual, as it is here, based on its intention to remove him to a country where he has affirmatively expressed a fear he will be tortured, and when the Government has failed to provide a proper review process, the Court should find that continued detention is unreasonable and violates his procedural due process rights guaranteed by the Fifth Amendment.  *See D.V.D.*, 2026 WL 521557, at *42, *44.; *see, e.g., Aguilar Rodriguez v. Bacon*, 1:25-cv-03695, (D. Md. Jan. 9, 2026).  It is appropriate relief because while securing release from illegal custody is the traditional function of the writ of habeas corpus, "immediate physical release [is not] the only remedy under the federal writ of habeas corpus."  *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (quoting *Peyton v. Rowe*, 391 U.S. 54, 67(1968)).  A district court's habeas jurisdiction includes challenges to immigration-related detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003).

## CONCLUSION

It is for these reasons, that Mr. Juan Navarro asks this court for immediate release, and to order that Respondents may not re-detain Petitioner unless they:  (1) Obtain a valid travel document for Cuba, (2) provide the travel document to Petitioner and Petitioner's counsel, (3) offer Petitioner the opportunity to leave the country on his own within two months, and (4) the Petitioner fails to leave the country.  Only under such circumstances may Respondents  re-detain Petitioner, provided they have also already made concrete arrangements for Petitioner to be put on a flight to Cuba.   Further, Respondents may not remove Petitioner to a third country without first complying with the four consecutive removal commands as articulated by the Supreme Court in *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 338 (2005), providing written notice to

both Petitioner and Petitioner's counsel in a language Petitioner can understand, and providing

meaningful opportunity to be heard in reopened removal proceedings with a hearing before an

immigration judge.

Respectfully submitted,

JORGE JUAN NAVARRO

By his attorneys,

*/s/ Heather Perez Arroyo*

Heather Perez Arroyo, Esq.
BBO # 698460
Christina A. Rodriguez, Esq.
BBO# 673651
Massachusetts Law Reform Institute
40 Court Street, Suite 700
Boston, MA 02108
(201) 247-7032
harroyo@mlri.org
crodriguez@mlri.org

Dated: March 20, 2026

**Certificate of Service**

I, Heather P. Arroyo, counsel for Petitioner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). I am not aware of any non-registered participants.

Dated: March 20, 2026                    By: */s/ Heather Perez Arroyo*

15