UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JORGE JUAN NAVARRO,<br><br>Petitioner,<br><br>v.<br><br>TODD LYONS, in his official capacity as Acting Director of U.S. Immigrations and Customs Enforcement,<br>DAVID WESLING, in his official capacity as Acting ICE Boston Field Office Director, U.S. Immigration and Customs Enforcement,<br>ANTONE MONIZ, in his official capacity as Superintendent, Plymouth County Correctional Facility,<br><br>Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION<br>NO. 26-10876-WGY |

YOUNG, D.J.                                         March 25, 2026

**STAY ORDER**

Petitioner Jorge Juan Navarro ("Juan Navarro") filed his petition, Pet. Writ Habeas Corpus, ECF No. 1, on February 16, 2026. He came to the United States from Cuba in or around July 1992, id. ¶¶ 2, 21, was issued a final order of removal on or around November 20, 2001, but "Cuba would not accept him," id. ¶ 4, see ¶¶ 3, 24. Juan Navarro was convicted of criminal offenses in 1998 and 2009. Id. ¶ 23. ICE issued an order of supervision on or around November 18, 2014 and Juan Navarro has

complied with it since.  Id. ¶¶ 6-7, 25.  Juan Navarro was arrested and detained in ICE custody at the ICE Boston Field Office after he presented himself for a check-in appointment on February 16, 2026.  Id. ¶¶ 8-9, 28.

Juan Navarro alleges Immigration and Nationality Act and Fifth Amendment Due Process violations because he "continues to be detained for immigration purposes when ICE knows that it cannot promptly effect Mr. Juan Navarro's removal from the United States, and such detention is not reasonably required to ensure Mr. Juan Navarro's compliance with the terms of his order of supervision . . . ."  Id. ¶ 37; see id. ¶¶ 42-43.

Respondents filed their response, Resp'ts' Opp'n Pet'r's Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2241 ("Resp'ts' Opp'n") ECF No. 7, on February 24, 2026,[1] stating that Juan Navarro, a Cuban citizen, is being detained under 8 U.S.C. § 1231(a)(6) following a revocation of his Order of Supervision ("OSUP").  Id. at 2-3.  Respondents argue his detention is legal as Juan Navarro was convicted of an aggravated felony and thus falls within the purview of section 1231(a)(6) as an individual fulfilling certain grounds for removability pursuant to section 1227(a)(2)(A)(iii).  Id. at 6.  Respondents also explain how

---

[1] Respondents are all represented by the United States Department of Justice.

they promptly may effectuate Juan Navarro's removal to Mexico as a country with a "standing agreement" with the United States to accept Cuban Nationals, alleging over 6,000 successful removals of Cuban Nationals in fiscal years 2025 and 2026. Id. at 8. Respondents further argue that the revocation of the Juan Navarro's OSUP was legal as the regulation provides ICE with "significant discretion" to revoke it under 8 U.S.C. § 241.4 and § 241.13. Id. at 8; see also id. at 9.

The gist of this habeas petition focuses on Juan Navarro's concerns surrounding his pending deportation to Mexico, not his native land, Cuba. Since Juan Navarro's concerns largely overlap with those raised in D.V.D. v. U.S. Dep't of Homeland Sec., No. CV 25-10676-BEM, 2026 WL 521557 (D. Mass. Feb. 25, 2026) (Murphy, J.), appeal docketed, No. 26-1212 (1st Cir. Feb. 28, 2026); see also Order, No. 26-1212 (1st Cir. Mar. 16, 2026) (granting Defendant's emergency motion for stay pending appeal), this Court held an oral hearing on March 9, 2026. Elec. Clerk's Notes, ECF No. 14. Not surprisingly, Juan Navarro's counsel raised a plethora of procedural issues, big and small. Respondents' counsel's response could be paraphrased as: "Nothing to look at here, everything is properly nailed down and deportation is commensurate with both procedural and substantive due process." See Hr'g Tr. 20-27, ECF No. 19. While helpful,

[3]

the oral arguments were too conclusory to warrant immediate resolution.  The Court therefore called for further briefing and asked for actual evidence -- not ICE declarations -- from Respondents.  Elec. Clerk's Notes; Hr'g Tr. 22:16-25. Respondents' counsel agreed -- in particular, that she would produce the agreement between the United States and Mexico whereby Mexico agreed to accept Cuban nationals deported by the United States.  Hr'g Tr. 21:14-25, 23:1-7.

On March 13, 2026, Respondents' counsel informed the Court:

> . . . Mexico has a standing (unwritten) agreement with the United States to accept Cuban Nationals for removal and that no travel document is necessary.  [ICE declaration omitted]  ICE removed approximately 6,000 Cuban nationals to Mexico in the last year.  Based on this agreement and successful removals, it is clear removal to Cuba was considered to be impractical, inadvisable, or impossible.  8  U.S.C.  § 1231(b)(1)(C)(iv).

Resp'ts' Suppl. Briefing 10, ECF No. 17.[2]

---

[2] The inconsistency of Respondents' representations is even more glaring considering they expressed their readiness to provide the underlying documents, but now state that the removals to Mexico are somehow based on a "CHVN agreement" establishing a parole process for Cubans, Haitians, Venezuelans, and Nicaraguans from January 2023, which suggests that they should have known whether a written version exists or not.  See Resp'ts' Suppl. Briefing 3-4.

[4]

What?

Can this be true?  There's some **unwritten** deal[3] between two sovereign nations whereby 6,000 Cuban nationals have already been shipped to Mexico?  Is this deal secret?  Put aside the striking illogic of arguing "we're already doing this on a grand scale so it must be okay," this is but a stark admission that here there's no process at all beyond "it is what we say it is." At some point, judicial restraint and deference to the executive's statutory duties become abdication of my duty to exercise the judicial function.

On this woefully inadequate record, acquiescence to Respondents' position is such an abdication.  Accordingly, the better part of valor is to stay this case pending receipt of the mandate of the United States Court of Appeals for the First Circuit in D.V.D. v. U.S. Department of Homeland Security, No. 26-1212 (appeal filed February 28, 2026).  Such a stay is appropriate as the guidance of the First Circuit will -- or at least is expected to -- fill in with binding precedent many of the blanks in this area.

---

[3] Notably, Respondents, in a footnote, inform the Court that there "does not appear to be a written agreement" by pointing not to any primary source, nor providing any affidavits, but by citing to a third-party website, tracking human rights issues related to third-country deportations.  Resp'ts' Suppl. Briefing 4 n. 5.

[5]

To enable this Court promptly to act upon receipt of the First Circuit's mandate in D.V.D., counsel is invited to ponder, examine, and supplement the record (nothwithstanding the stay of ultimate action) with actual **evidence**.[4]

Consider these questions:

The Court needs to know everything there is to know about this so-called "unwritten agreement."[5]  When did it take effect?  What are its provisions?  What is its duration?  Does it operate only with Mexico or with other sovereign states?  Does it involve only Cuban nationals or, under this unwritten agreement, will Mexico take the nationals of other sovereign states?  What United States government official will step forward to admit binding the United States to an agreement with another sovereign state?  Who is the counterpart official in the government of Mexico?  Will he or she step forward?  Or is this agreement

---

[4] Affidavits of ICE officials that go further than admissions of what the affiant knows of his own personal knowledge (hearsay won't do) will be disregarded. "[A]ffidavit[s] [are] the Potemkin Village[s] of today's litigation landscape.  Purported adjudication by affidavit is like walking down a street between two movie sets, all lawyer-painted façade and no interior architecture." United States v. Massachusetts, 781 F. Supp. 2d 1, 22 n. 25 (D. Mass. 2011).

[5] At this juncture, the Court takes Respondents' counsel at her word that such an agreement actually exists and is not some post hoc figment of ICE's imagination or worse, a cloak for chicanery.

[6]

secret?  If so, why?[6]  Did the Senate consent?  Was it ever consulted?  Or even informed?[7]

If such unwritten agreement exists, of course there will be written evidence of it – directives, briefing papers, internal correspondence, all the debris of a functioning bureaucracy. This Court expects to see it all.

Step back and take a breath.  Can it be true that 6,000 Cuban nationals have already been sent to Mexico on a handshake?

---

[6] There are procedures in place whereby this Court may review such material.  This Court scrupulously followed such procedures in United States v. Reid, 214 F. Supp. 2d 84, 85 (D. Mass. 2002) ("the shoe bomber" case) and United States v. Wright, 285 F. Supp. 3d 443 (D. Mass. 2018), aff'd, 937 F.3d 8 (1st Cir. 2019).

[7] In the words of the distinguished late Senator Byrd, ". . . when Washington decided that, in the future, he would send the Senate written communications regarding treaties, he set the precedent that all of his successors have followed."  2 ROBERT C. BYRD, THE SENATE 1789-1989: ADDRESSES ON THE HISTORY OF THE UNITED STATES SENATE 6 (Wendy Wolff ed., 1991).  After all,

> [w]hen the thirteen colonies rebelled against the English king, they rejected the concept of monarchy on our shores.  When the Constitution created an executive branch and a president of the United States, it gave him no unchecked or unconditional powers.  The English king could make treaties exclusively on his own, but this would not be true for the American president.  The Constitution, instead, made treatymaking a concurrent power.  The United States Senate has carefully guarded its share of this power for two hundred years, as I trust it will continue to do, perpetually into the future of this Republic.

Id. at 23.

Are they "the worst of the worst,"[8] in ICE's mendacious public relations phraseology? What procedures, if any, were followed for these 6,000 folks? Were they turned away at the border or seized within the interior of the United States? How many in each category? How do the procedures followed with these "handshake" Cuban Hispanics compare with those foreign nationals from other racial groups?[9]

---

[8] See ARRESTED: WORST OF THE WORST, https://www.dhs.gov/wow (last visited March 23, 2026).

[9] The world watches. It apparently concludes our nation is a racist actor. The United Nations Committee on the Elimination of Racial Discrimination reports itself

> [d]eeply concerned about the reportedly increased use of racist hate speech, including the use of derogatory and dehumanizing language, and the dissemination of negative and harmful stereotypes targeting migrants, refugees, asylum seekers, including by portraying them as criminals or as a burden, by politicians and influential public figures at the highest level of the State Party, particularly its President, which fosters intolerance and may incite racial discrimination, hate crimes and hate speech, particularly on the Internet and social media, and about the insufficient measures to prevent and address racist hate speech . . . .

Comm. on the Elimination of Racial Discrimination, Decision 1 (2026), at 1. Cuba, Mexico, and the United States are all signatories to the International Convention on the Elimination of All Forms of Racial Discrimination. Opened for signature Mar. 7, 1966, 660 U.N.T.S. 195 (entered into force Jan. 4, 1969), the United States Senate ratified this convention in 1994. S. TREATY DOC. No. 95-18. "[W]e can not escape history. . . . The fiery trial through which we pass will light us down in honor or dishonor, to the latest generation." Abraham Lincoln, Second Annual Message to Congress (December 1, 1862) reprinted by THE AMERICAN PRESIDENCY PROJECT,

[8]

These few questions are illustrative, not exhaustive. The Court depends on counsel to pose and resolve **all** questions relevant to the determination of this habeas corpus petition.

For these reasons, this Court stays this case upon the terms discussed above[10] until the First Circuit issues its mandate in D.V.D. v. U.S. Department of Homeland Security. All the stay orders in this case remain in full force and effect until lifted by express order or vacated by a court with a higher commission.

**SO ORDERED.**

_____
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[11]

_____

https://www.presidency.ucsb.edu/documents/second-annual-message-9 (last visited March 23, 2026).

[10] The Court will, however, consider Petitioner's custodial status pending the expiration of the stay.

[11] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.